TUCKER ELLIS LLP
Matthew I. Kaplan (SBN 177242)
matthew.kaplan@tuckerellis.com
515 South Flower Street, Forty-Second Floor
Los Angeles, CA 90071
Telephone:      213.430.3400
Facsimile:      213.430.3409

THE CONCEPT LAW GROUP, P.A.
ALEXANDER D. BROWN (FL BN 752665) (*pro hac vice* application forthcoming)
ABrown@ConceptLaw.com
ADAM S. GOLDMAN (FL BN 86761) (*pro hac vice* application forthcoming)
AGoldman@ConceptLaw.com
6400 N. Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
Telephone:      754.300.1325
Facsimile:   754.300.1501

Attorneys for Plaintiff
ATM METABOLICS, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATM METABOLICS, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>HOLISTA COLLTECH LIMITED,<br>IGALEN, INC., RAJEN MANICKA, and<br>KOSTA GARA<br><br>                    Defendants. | Case No. 19-cv-00170-MMA-MDD<br><br>**AMENDED COMPLAINT FOR TRADEMARK INFRINGEMENT, TRADEMARK COUNTERFEITING, PATENT INFRINGEMENT, BREACH OF CONTRACT, AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, ATM METABOLICS, LLC, alleges as follows:

## PARTIES

1.      Plaintiff, ATM METABOLICS, LLC ("ATM"), is a limited liability company organized and existing under the laws of the State of Florida, with a principal place of business at 6039 Cypress Gardens Blvd., #313, Winter Haven, Florida 33884.

2.      Defendant, HOLISTA COLLTECH LIMITED ("Holista"), is an Australian limited company, located at Suite 12, Level 1, 11 Ventor Avenue, West Perth, WA, Australia 6005.

3.     Defendant, IGALEN, INC. ("iGalen"), is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 600 West Broadway, Suite 700, San Diego, CA 92101.

4.     Defendant, RAJEN MANICKA ("Rajen"), is an individual believed to be a citizen of, and residing in, Malaysia, is over the age of 18, and is otherwise *sui juris*.

5.     Defendant, KOSTA GARA ("Gara"), is an individual believed to be residing in Florida, is over the age of 18, and is otherwise *sui juris*.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Holista because it does business in California, and has entered into an agreement providing for jurisdiction in this judicial district.

7.     This Court has jurisdiction over iGalen because it has an active place of business in California, and has engaged in unlawful practices, including trademark and patent infringement, and trademark counterfeiting, in this judicial district.

8.     This Court has jurisdiction over Rajen, and Gara because each directed, controlled, ratified, participated in, and/or was the moving force behind Holista's and iGalen's unlawful practices, including its manufacturing, marketing, and selling of certain products which infringe ATM's trademark and patents in this judicial district, and which products are directed to consumers in this judicial district.

9.     This Court has subject matter jurisdiction over this action under 15 U.S.C. §1121, and under 28 U.S.C. §§ 1331 and 1338(a), because this case arises under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051, *et seq.*, as well under the Patent Act, 35 U.S.C. §§ 271, *et seq.*

10.     This Court has supplemental jurisdiction over all of the state law claims herein under 28 U.S.C. § 1367 because those claims are joined with, and are so related to Plaintiffs' claims under the Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051, *et seq.*, as well under the Patent Act, 35 U.S.C. §§ 271, *et seq.*, over which this Court has original jurisdiction, such that they form part of the same case or controversy under Article III of the United States Constitution.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

11.    Venue is proper in this Court because ATM and Holista entered into an agreement providing for jurisdiction in this judicial district.

12.    All conditions precedent have been met, waived, or satisfied to bring this lawsuit.

## GENERAL ALLEGATIONS

### Background of ATM

13.    ATM is a leading research firm dedicated to the discovery of new and useful ways to improve metabolic and neurological function.

14.    Since 2007, Dr. M. Joseph Ahrens ("Dr. Ahrens") has served as the Managing Director and Chief Executive Officer (CEO) of ATM.  Dr. Ahrens has been involved in nutrition research since 1989, and involved in the research and development of methods of using natural ingredients to improve health since 2001.

15.    In 2015 and 2016, Dr. Ahrens was nominated for the Nobel Prize for his breakthrough work using natural ingredients to address major health issues such as diabetes, Alzheimer's, Ebola, SARS (Severe Acute Respiratory Syndrome), and even the flu.

16.    Consistent with such work, Dr. Ahrens and his co-inventor (Daryl Thompson) developed a groundbreaking supplement that consists of a naturally derived compound that has a unique ability to support the human metabolic pathway.

17.    This revolutionary discovery has been marketed under the Emulin® Mark by ATM and its licensees since at least 2010, and has proven instrumental in improving the lives of individuals worldwide.

18.    The cutting-edge nature of this particular discovery has been granted patent protection by the United States Patent and Trademark Office through the issuance of U.S. Patent Nos. 7,943,164 and 8,198,319 (the "Emulin® Patents"), and is also the subject of thirteen issued or pending patents worldwide.

19.    The Emulin® name is also registered with the USPTO under Registration No. 3941075 in International Class No. 5 for use in connection with "Dietary and nutritional

3

supplements for weight loss; dietetic foodstuffs and nutritional additives for medical purposes for use in foods and dietary supplements for human and animal consumption; foods for medically restricted diets, dietary supplemental drinks" with a first use and first use in commerce date of December 10, 2010. The Emulin® Mark is Incontestable pursuant to 15 U.S.C. §1065.

**Holista and iGalen, Inc.**

20.     Holista is engaged in the preparation, manufacture, distribution, and sale of "nutraceutical" products.

21.     Rajen is the Founder and CEO of Holista, and, upon information and belief, directs, controls, ratifies, participates in, and/or is the moving force behind Holista's business decisions, particularly as it concerns Holista's relationship with ATM (as detailed below).

22.     In order to facilitate distribution and sales of such products, Holista works through iGalen, of which Holista owns 47%, to manage and grow a distribution network for its nutraceutical products.

23.     More specifically, iGalen is a network marketing company with independent distributors responsible for selling Holista's nutraceutical products – in this case, Emulin®.

24.     Gara is the Chief Corporate Advisor of iGalen, and, upon information and belief, directs, controls, ratifies, participates in, and/or is the moving force behind iGalen's business decisions as it concerns its relationship with ATM (as detailed below).

25.     Although technically separate entities, Holista and iGalen share overlapping common ownership of some shareholders, and also share common executive personnel. For example, Holista's CEO, Rajen, is also a shareholder of iGalen and serves as iGalen's CEO.

26.     As it relates to the facts germane to this suit, Holista, through iGalen, built its Emulin® sales force primarily through two individuals; to wit: Dori O'Neill and Jana Jorgenson, both of whom maintain active relationships with hundreds of sales force team members.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

27.     Indeed, O'Neill and Jorgenson, and their respective sales team networks, accounted for approximately 60% of Holista/iGalen's sale force, and approximately 60%-70% of Holista/iGalen's sales volume.

28.     Not surprisingly, at all times relevant to this lawsuit, Holista/iGalen held O'Neill and Jorgenson out to ATM as their top distributors. In fact, upon information and belief, Jorgenson was the highest level distributor in iGalen, and the only distributor to achieve Triple Diamond status.

**Relationship Between ATM, Holista, and iGalen**

29.     On January 9, 2017, ATM and Holista entered into an Exclusive Product Management Agreement and Distribution Agreement (the "Agreement") with an initial five-year term.  A true and correct copy of the Agreement is attached as Exhibit A.

30.     This Agreement granted Holista, in part, the exclusive right to market, promote, and sell Emulin®[1] in the Multi-Level-Marketing ("MLM") space throughout the world, in exchange, in pertinent part, for royalty payments.

31.     It was understood and agreed between the Parties that iGalen would be the MLM company responsible for growing a distribution network through which the Emulin® products would be sold.

32.     However, as explained below, Holista has failed to meet its contractual obligations since the inception of the Agreement, and has strung ATM along for more than one year with promises (that would eventually prove to be false) that Holista's poor performance would improve.

33.     For instance, Holista's sales have been well-below expectations since the inception of the Agreement, and Holista oftentimes has been unable to provide ATM with monthly sales reports.

---

[1] More specifically, the "Product," as defined in Section 1.1(g) of the Agreement, refers to "that certain nutritional supplement designed, developed, marketed, and sold by ATM as detailed in US patent 7,943,164 and any other worldwide patents, described as a natural, over-the-counter plant-based compound that works with enzymes to metabolize carbohydrates and lower blood sugar levels."

FIRST AMENDED COMPLAINT

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

34.     Over time, it became clear that Holista did not have the proper systems in place to effectively fulfill its contractual obligations. Indeed, ATM was often told by some of Holista's distributors (*i.e.*, those working under iGalen) that Holista's back-office, sign-up procedures and software were cumbersome and ineffective, which resulted in lost sales.

35.     In fact, distributors complained to ATM that orders of Emulin® were oftentimes severely delayed, or never arrived at all. This caused the distributors to lose customers, and in the process, damaged the reputations of ATM, Dr. Ahrens, and many of the distributors working under iGalen, all of which ultimately served to tarnish the Emulin® brand.

36.     Nevertheless, Holista's CEO, Rajen, consistently told ATM not to worry because, as he explained, Holista was building its distributor team (*i.e.*, through iGalen) and that everything would beneficially "blow up" in short order.  In reliance upon these representations, ATM continued to support Holista.  Holista's performance, however, failed to improve.

37.     Although Holista, through iGalen, was attempting to build a sales force, ultimately it was one final self-inflicted wound that served as the proverbial final nail in the coffin that rendered Holista unable to fulfill its contractual obligations.

38.     Over time, O'Neill and Jorgenson (Holista/iGalen's top distributors) grew frustrated with Holista/iGalen's performance and inability to competently support its distributors and their customers, and expressed these concerns to ATM and Dr. Ahrens from time-to-time. Nevertheless, due to Holista's promises of improved performance, O'Neill and Jorgenson encouraged ATM to "hang on."

39.     Shockingly, however, and despite their positions as the top sales leaders for Holista/iGalen, in September 2018 Holista/iGalen inexplicably suspended O'Neill and Jorgenson from Holista/iGalen's Executive Leadership Working Group.

40.     Upon information and belief, these suspensions were a result of O'Neill and Jorgenson complaining to ATM and Dr. Ahrens about Holista/iGalen.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

41.    Worse, thereafter, Holista/iGalen fired O'Neill and Jorgenson, effectively eliminating 60-70% of their sales volume, and crippling Holista/iGalen's ability to perform under the Agreement.

42.    Upon information and belief, the fallout from the firings of O'Neill and Jorgenson resulted in 80% of iGalen's sales force quitting, which further crippled Holista/iGalen's ability to perform under the Agreement.

43.    Since the firings of O'Neill and Jorgenson, Holista has failed to pay the monthly royalty fees to ATM, and has otherwise been unable to fulfill its obligations under the Agreement.

### Holista's Contractual Breaches

A.    *Monthly Royalty Payments*

44.    Section 3 of the Agreement requires that Holista pay a monthly royalty to ATM in the amount of $15,000.00, plus an additional monthly royalty for each unit sold, all of which is to be paid on the 15th day of each month.

45.    However, the $15,000.00 monthly license fees due for November and December 2018, and January 2019 have not been received, nor have any royalty payments been received since August 2018.

46.    As of the filing of this Complaint, Holista remains in material default for these non-payments under the Agreement.

B.    *Customer Relations*

47.    Section 4.5 of the Agreement provides, "Holista shall provide all customer relations to customers and end users of the Product, and respond to customer queries via email or telephone support line."

48.    Holista has failed to adhere to Section 4.5, as Holista failed to provide customer service, which caused complaining customers and distributors to direct their concerns to ATM.

49.    More troubling, ATM and Dr. Ahrens were often left to respond to these complaints and questions without substantive support from Holista, which created a drain

on ATM and Dr. Ahrens, and frustration for all parties, particularly because ATM and Dr. Ahrens were not involved with the issues raised by the customers and distributors, and thus, were unable to resolve customer issues.

50.     In fact, in derogation of its obligations, Holista even suggested that ATM create a Facebook page to handle customer and distributor complaints.

51.     Incredibly, despite Holista's failure to handle all customer relations issues, which led to those inquiries being directed to ATM, Rajen demanded that ATM and Dr. Ahrens refrain from speaking with any distributors as doing so, he claimed, would breach the Agreement.

###### *C.     Operations and Expenses*

52.     Section 5.2 of the Agreement provides that Holista will pay Dr. Ahrens to assist in the promotion of Emulin® and be reimbursed for his expenses.  Specifically, this section provides, in part, "[i]t is understood and agreed that the following costs of such assistance shall be borne by Holista: (i) Speaking Fees: $500/appearance (North America); $3,500 for a week appearance overseas; and (ii) All travel-related expenses (taxis, car rental and premium economy class airline travel)."

53.     Despite ATM and Dr. Ahrens' submission for requests for reimbursement for travel and speaking fees, Holista has not paid such reimbursements or fees, which total at least $23,282.18.

###### *D.     Termination for Material Change in Sales Personnel, Sales & Marketing Capability, and Financial Condition of Holista*

54.     Section 8.2(c) provides that the Agreement may be immediately terminated by ATM if there should occur,

> …any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Holista that prevents Holista from fulfilling its obligations hereunder.

55.     As explained above, Holista unilaterally and without cause terminated its two largest and most productive sales teams working under iGalen, the teams that were

managed by O'Neill and Jorgenson.

56. Prior to their unilateral dismissal, O'Neill and Jorgenson accounted for more than 60% of Holista's sales force and approximately 60%-70% of Holista's sales volume. Their unilateral dismissal created additional fallout resulting in more than an 80% reduction in Holista's overall sales force.

57. Tellingly, following the unilateral dismissals, Holista has failed to remit the monthly license fees and monthly royalty fees.

58. The removal of O'Neill and Jorgenson, combined with the subsequent fallout of the loss of more of Holista/iGalen's salesforce, constitutes a material change in sales personnel, sales and marketing capability, and financial condition of Holista that has prevented and continues to prevent Holista from fulfilling its contractual obligations.

59. Accordingly, on January 8, 2019, ATM terminated the Agreement pursuant to Section 8.2(c) via written notice to Holista (the "Termination Letter"). A true and correct copy of the Termination Letter is attached as Exhibit B.

60. Holista, however, disputes that the firings created a material change in its sales personnel, sales and marketing capability, and financial condition, and disputes the validity of the Termination Letter. A true and correct copy of Holista's Letter is attached as Exhibit C.

### E. *Purchase of Inventory Following Termination*

61. Section 8.4 provides that within 60 days from the date of termination of the Agreement, ATM, at its option, may elect to purchase Holista's remaining inventory.

62. Accordingly, on March 6, 2019, ATM sent Holista a letter informing Holista that ATM intended to exercise its option to purchase from Holista its remaining inventory of "Emulin C" and "Emulin E", and requested that Holista provide information regarding its inventory so that ATM could firmly commit to making such purchases. A true and correct copy of the March 6, 2019 Letter is attached as Exhibit D.

63. Holista responded by asserting that ATM's termination of the Agreement was "improper, and, accordingly, ATM has waived its right to purchase all or any part of the

remaining inventory." A true and correct copy of Holista's response letter is attached as Exhibit E.

64. When ATM asked Holista for the basis for ATM's alleged waiver, Holista's counsel responded, "I will respectfully decline to elaborate on my client's position on this issue." A true and correct copy of the email exchange is attached as Exhibit F.

65. Thus, Holista has not only refused to furnish the requested information, it has refused to even provide the legal or factual basis for such refusal. Accordingly, Holista has frustrated the purpose of this contractual provision, and preventing ATM from exercising its option to purchase Holista's remaining inventory.

F.  *Holista's Obligations Upon Termination*

66. Section 8.3 of the Agreement provides that within 60 days of termination of the Agreement, Holista shall "refrain from using any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM and shall return to ATM and immediately cease all use of Confidential Information previously furnished by ATM."

67. Despite demand from ATM on April 8, 2019, Holista refuses to comply with obligations under Section 8.3. iGalen has also refused to cease all use of the ATM Marks. A true and correct copy of the April 8, 2019 Letter is attached as Exhibit G.

68. Moreover, despite demand from ATM on April 9, 2019 for Holista and iGalen to cease all use of Dr. Ahrens's name, image, and likeness, Holista and iGalen have refused to do so. A true and correct copy of the April 9, 2019 Letter is attached as Exhibit H.

69. As a direct and proximate result of Holista's and iGalen's acts complained of herein, ATM has been forced to retain the undersigned law firms, and has agreed to pay said firm a reasonable fee for their services, and to pay all costs associated with the prosecution of this matter.

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

# FIRST CAUSE OF ACTION

## Temporary and Permanent Injunctive Relief

### (Against all Defendants)

70.     ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

71.     This is an action for temporary and permanent injunctive relief pursuant to common law principles, Title 15, United States Code, Section 1117 of the Trademark Act, and Title 35, United States Code, Section 283 of the Patent Act.

72.     As alluded to in more detail above, Holista and iGalen have continued to market and sell products under the Emulin® Mark and covered by the Emulin® Patents after the Agreement was terminated.

73.     Holista and iGalen continue to brazenly engage in this unlawful conduct, despite having been warned that it may not market and sell products under the Emulin® Mark and covered by the Emulin® Patents after the Agreement was terminated.

74.     Upon information and belief, Rajen and Gara direct, control, ratify, participate in, and/or are the moving forces behind Holista's and iGalen's practices, including their manufacturing, marketing, and selling of certain products under the Emulin® Mark and covered by the Emulin® Patents after the termination of the Agreement.

75.     Such refusal to honor ATM's clear intellectual property rights in and to the Emulin® Mark and Emulin® Patents has caused, and will continue to cause, irreparable harm.  Each day that ATM is deprived of these intellectual property rights causes irreparable injury.

76.     ATM has no adequate remedy at law, especially because the property at issue is intellectual property from which ATM is being deprived.

77.     In light of the facts of this case, there is a substantial likelihood that ATM will succeed on the merits.

## SECOND CAUSE OF ACTION

## TRADEMARK INFRINGEMENT

## (15 U.S.C. § 1114)

(Against all Defendants)

78.     ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

79.     ATM is the legal and rightful owner of the federally registered incontestable trademark, Emulin®, Registration No. 3941075, in connection with "Dietary and nutritional supplements for weight loss; dietetic foodstuffs and nutritional additives for medical purposes for use in foods and dietary supplements for human and animal consumption; foods for medically restricted diets, dietary supplemental drinks." This registration enjoys a priority-of-use date of at least December 10, 2010.

80.     This registration also enjoys a statutory presumption of validity, ownership of the mark, and ATM's exclusive right to use and license the Emulin® Mark in connection with the aforementioned goods.

81.     The Emulin® Mark and formula have acquired significant recognition and goodwill in the minds of consumers, and the Mark is incontestable under 15 U.S.C. §§ 1058 and 1065.

82.     Pursuant to Section 8.3 of the Agreement, within 60 days of termination of the Agreement, Holista was required to "refrain from using any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM and shall return to ATM and immediately cease all use of Confidential Information previously furnished by ATM."

83.     These obligations extend to iGalen as the (formerly authorized) distribution network of Emulin® products.

84.     Despite demand from ATM 60 days after termination of the Agreement, Holista and iGalen refuse to cease use of the Emulin® Mark.

85.     Thus, without authorization, Holista and iGalen have used and continue to use

the Emulin® Mark in connection with the sale of Emulin® products.

86. Upon information and belief, Rajen and Gara are directing, controlling, ratifiying, participating in, and/or are the moving force behind Holista's and iGalen's unlawful use of the Emulin® Mark in connection with the sale of Emulin® products.

87. These acts are in direct and willful violation of §43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1114, in that Holista and iGalen have used the Emulin® Mark in connection with the sale of Emulin® products which is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of Holista and iGalen with ATM, and as to the origin, sponsorship, and approval of Holista's and iGalen's products and commercial activities by ATM.

88. The Defendants' acts are being performed in willful, deliberate, and/or intentional disregard of ATM's rights in the incontestable Emulin® Mark.

89. As a direct result of Defendants' actions and the likely confusion, mistake or deception, ATM has suffered damages in an amount not yet determined.

90. Defendants' conduct in this instance is exceptional, and, as such, ATM should be entitled to recover its attorneys' fees in this action pursuant to 15 U.S.C. § 1117(a) which provides, *in part*, that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."

### THIRD CAUSE OF ACTION

### Trademark Counterfeiting

(All Defendants)

91. ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

92. ATM is the legal and rightful owner of the federally registered incontestable trademark, Emulin®, Registration No. 3941075, in connection with "Dietary and nutritional supplements for weight loss; dietetic foodstuffs and nutritional additives for medical purposes for use in foods and dietary supplements for human and animal consumption; foods for medically restricted diets, dietary supplemental drinks." This registration enjoys

a priority-of-use date of at least December 10, 2010.

93.  This registration also enjoys a statutory presumption of validity, ownership of the mark, and ATM's exclusive right to use and license the Emulin® Mark in connection with the aforementioned goods.

94.  The Emulin® Mark and formula have acquired significant recognition and goodwill in the minds of consumers, and the Mark is incontestable under 15 U.S.C. §§ 1058 and 1065.

95.  Pursuant to Section 8.3 of the Agreement, within 60 days of termination of the Agreement, Holista was required to "refrain from using any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM and shall return to ATM and immediately cease all use of Confidential Information previously furnished by ATM."

96.  These obligations extend to iGalen as the (formerly authorized) distribution network of Emulin® products.

97.  Despite demand from ATM 60 days after termination of the Agreement, Holista and iGalen refuse to cease use of the Emulin® Mark, and continue to use the Emulin® Mark without authorization.

98.  Upon information and belief, Rajen and Gara are directing, controlling, ratifiying, participating in, and/or are the moving force behind Holista's and iGalen's unlawful use of the Emulin® Mark in connection with the sale of Emulin® products.

99.  Defendants' acts are in direct and willful violation of §43(a) of the Trademark Act of 1946, as amended, 15 U.S.C. § 1114, in that Defendants have used the Emulin® Mark in a spurious manner which is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of Holista and iGalen with ATM and as to the origin, sponsorship, and approval of Holista's and iGalen's products and commercial activities by ATM.

100.  Defendants' unlawful actions constitute trademark counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1114.

101.  Defendants' actions are being performed in willful, deliberate, and/or intentional disregard of ATM's rights in the incontestable Emulin® Mark.

102.  As a direct result of Defendants' actions and the likely confusion, mistake or deception, ATM has suffered damages in an amount not yet determined.

103.  Defendants' conduct in this instance is exceptional, and, as such, ATM should be entitled to recover its attorneys' fees in this action pursuant to 15 U.S.C. § 1117(a) which provides, *in part*, that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."

## **FOURTH CAUSE OF ACTION**
### **Willful Patent Infringement**
### **(35 U.S.C. § 271)**

104.  ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

105.  This is an action for direct and indirect patent infringement pursuant to Title 35, United States Code, Section 271, of the United States Patent Act.

106.  ATM is the assignee of the Emulin® Patents.

107.  Holista and iGalen have infringed, and continue to infringe, one or more claims of at least U.S. Patent Nos. 7,943,164 ("the '164 Patent") by, at least, making, using, selling, or offering for sale, the Emulin® product without the permission of ATM.

108.  Specifically, Holista and iGalen have infringed, literally and under the doctrine of equivalents, one or more claims of at least the '164 Patent by using, making, selling, and offering to sell the Emulin® product after termination of the Agreement and without permission from ATM.

109.  As set forth above, Holista and iGalen knew *at the absolute latest* since Holista entered into the Agreement in 2017 that the Emulin® formula was patented.

110.  All such infringing conduct of Holista and iGalen has occurred and was committed in a willful manner by *at least* its knowledge of the Emulin® Patents, and its

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

knowledge that it had no right to make, use, offer for sale, or sell any Emulin® product after the termination of the Agreement on January 8, 2019.

111.   Nevertheless, Holista and iGalen have continued to unlawfully market and sell products bearing the Emulin® brand, and advertised as containing a formula covered by at least one of the Emulin® Patents, specifically the '164 Patent.

112.   Such illegal sales are being made at least *via* iGalen's independent distribution network.

113.   Holista and iGalen have no legal right to manufacture, market, offer for sale, or sell any product called or containing Emulin®, yet they continue to do so.

114.   Holista's and iGalen's actions have caused, and continue to cause harm to ATM.

115.   Holista's and iGalen's conduct in this instance is exceptional, and, as such, ATM should be entitled to recover its attorneys' fees in this action pursuant to 35 USC § 285 which provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."

## FIFTH CAUSE OF ACTION

### Breach of Written Contract

(Against Holista)

116.   ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

117.   ATM and Holista entered into a binding written agreement (*i.e.* the Agreement).

118.   ATM adhered to its contractual obligations.

119.   Holista has breached this Agreement by, *at least*, (i) failing to make the required monthly license fees and royalty payments, (ii) failing to address and handle all customer relations, (iii) failing to reimburse ATM for speaking fees and travel-related expenses, (iv) causing a material change in sales personnel, sales and marketing capability, and financial condition of Holista during the term of the Agreement, (v) refusing to permit

to ATM to purchase inventory after the termination of the Agreement, and (vi) refusing to cease using the ATM Mark, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM after termination of the Agreement.

120. As a direct and proximate result of the foregoing breaches, ATM has been damaged in amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Declaratory Relief

### (28 U.S.C. § 2201; Cal. Code Civ. Proc. § 1060; Business and Prof. Code § 16600)

121. ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

122. Section 5.2(b) of the Agreement, titled, Exclusivity, provides, in pertinent part,

> Following the termination of this Agreement, Ahrens further agrees to refrain from providing services to any individual or entity operating in the MLM industry that competes with Holista for a period of three (3) years following the termination date.

123. There is an actual, present, and bona fide controversy between ATM and Holista as to Dr. Ahrens post-termination obligations under Section 5.2(b) of the Agreement.

124. Indeed, ATM and Dr. Ahrens wish to pursue other employment possibilities, but Holista intends to enforce Section 5.2(b).

125. ATM believes Section 5.2(b), construed according to California law, is void and unenforceable as an unreasonable and unlawful restraint on Dr. Ahrens' right to work, and ATM seeks a judicial declaration that it and Dr. Ahrens can pursue other gainful employment opportunities and declaring Section 5.2(b) is null and void.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

### (28 U.S.C. § 2201; Cal. Code Civ. Proc. § 1060; Business and Prof. Code § 16600)

126.   ATM realleges and reavers paragraphs one through sixty-nine as if fully set forth herein.

127.   Section 8.2(c) of the Agreement provides that ATM may immediately terminate the Agreement if there occurs "any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Holista that prevents Holista from fulfilling its obligations hereunder."

128.   ATM believes it validly terminated the Agreement via the Termination Letter on January 8, 2019. Alternatively, and *at the absolute latest*, ATM believes it terminated the Agreement via letter on April 8, 2019 due to Holista's breach of Section 3 of the Agreement.

129.   However, on January 9, 2019, Holista disputed the validity of the Termination Letter, and stated it would "seek appropriate judicial redress based thereon." *See* Exhibit C. Holista has not formally disputed ATM's April 8, 2019 termination, but continues to act as if the Agreement is still in effect.

130.   As such, there is an actual, present, and bona fide controversy between all Parties as to whether the Agreement has been terminated, and ATM desires a judicial determination as to its rights and duties.  ATM seeks a judicial declaration of the Parties' rights and duties as to whether the Agreement has been terminated.

## PRAYER

WHEREFORE, ATM prays for judgment in their favor and against Defendants containing the following provisions:

1.   A temporary and permanent injunction enjoining Defendants, and all of those acting in concert with them, including, but not limited to, their agents, affiliates, subsidiaries, officers, directors, attorneys and employees (a) from using the Emulin® Mark or any similar trademark, trade name, logo, corporate name, service mark, (b) from

TUCKER ELLIS LLP

Chicago ♦ Cleveland ♦ Columbus ♦ Houston ♦ Los Angeles ♦ San Francisco ♦ St. Louis

making, using, selling or offering for sale any product covered by any of the claims of the Emulin® Patents (and, specifically, the '164 Patent); (c) requiring them to immediately remove any and all products advertising with the Emulin® Mark from its websites and any other sites on which the Emulin® Mark appears; (d) requiring them to destroy all labels, stickers, signs, prints, packages, products, wrappers, receptacles, advertisements, signage, and any written or printed materials, including product labels, in their possession, custody, or control which bear the Emulin® Mark alone or in combination with any other words, marks, or other elements; and (e) requiring Defendants to file with the Court, and serve upon ATM's counsel, within thirty (30) days after entry of an order or judgment, a report, in writing, and under oath, setting forth, in detail, the manner and form in which Defendants have complied with the requirements of the injunction and order;

2.     A declaration that Section 5.2(b) of the Agreement is void and unenforceable;

3.     A declaration that the Agreement was terminated as of January 8, 2019, or, at the very latest, April 8, 2019;

4.     A declaration deeming this case exceptional and trebling the damages awarded to ATM;

5.     An award of damages against Defendants in an amount to be proven at trial, including pre- and post-judgment interest;

6.     An award of costs of suit, including attorneys' and expert fees, expenses and disbursements; and

7.     Such other and further relief as the Court deems just and proper.


DATED:  April 15, 2019.                    TUCKER ELLIS LLP


                                           By:     */s/ Matthew I. Kaplan*
                                           _____
                                           Matthew I. Kaplan
                                           Attorneys for Plaintiff
                                           ATM METABOLICS, LLC

FIRST AMENDED COMPLAINT

## Exhibits to Amended Complaint for Trademark Infringement, Trademark Counterfeiting, Patent Infringement, Breach of Contract, and Declaratory Relief

| Exhibit | | Page No. |
|---------|---|----------|
| A | Exclusive Product Management and Distribution Agreement | 1 |
| B | January 8, 2019 letter terminating agreement | 11 |
| C | January 9, 2019 letter in response to January 8, 2019 letter | 12 |
| D | March 6, 2019 letter regarding intention to purchase remaining inventory | 13 |
| E | March 7, 2019 letter in response to March 6, 2019 letter | 14 |
| F | March 8, 2019 e-mail from Seth Wiener to Adam Goldman regarding intention to purchase remaining inventory | 15 |
| G | April 8, 2019 letter regarding breach of Section 8.4 of the Product Management and Distribution Agreement | 17 |
| H | April 9, 2019 follow-up letter to April 8, 2019 letter | 19 |

**EXCLUSIVE PRODUCT MANAGEMENT AND DISTRIBUTION AGREEMENT**

This EXCLUSIVE PRODUCT MANAGEMENT AND DISTRIBUTION AGREEMENT ("Agreement") is entered into on the 9th day of January 2017, by and between ATM Metabolics, LLC ("ATM"), a Florida limited liability company located at 6039 Cypress Gardens Boulevard, No 313, Winter Haven, FL, USA 33884, and Holista Colltech, Ltd., ("Holista"), an Australian limited company located at Suite 12, Level 1, 11 Ventnor Avenue, West Perth, WA, Australia 6005.

**RECITALS**

WHEREAS, ATM is a company engaged in the research and development of a certain nutraceutical Product (EMULIN® and/or EMULIN PLUS® as further defined below,) and owns the confidential scientific and technical information, trade secrets, patents, and proprietary know-how concerning the Product;

WHEREAS, Holista is engaged in the preparation, manufacture, distribution, and sale of nutraceutical Products throughout the world;

WHEREAS, Holista desires to acquire an exclusive right and license to market, promote, distribute, and sell the Product on a worldwide basis, and to manage the ingredient sourcing and manufacture of the Product;

WHEREAS, ATM desires to grant a license to Holista in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, and the respective representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, the Parties agree as follows:

**AGREEMENTS**

**SECTION ONE:   DEFINED TERMS**

1.1    **Defined Terms:** As used in this Agreement, and unless the context otherwise requires, capitalized terms shall have the meanings set forth below.

(a)    "Agreement" shall mean this Agreement and all Schedules and Exhibits hereto.

(b)    "Confidential Information" shall mean any and all regulatory, technical, manufacturing, business, financial, operational, administrative, marketing or economic information, data, documents, designs, patents, materials, Product samples and know-how pertaining to ATM or Holista, as the case may be, disclosed by either Party to the other Party in whatever form in connection with the performance of this Agreement by the Parties, as well as any and all written information, documents and designs of whatsoever kind marked in English, or otherwise identified, as confidential or proprietary or secret.

(c)    "Intellectual Property" shall mean all patents, patent rights, designs, copyrights, trademarks, trade secrets and other legal interests (whether registered or otherwise) associated with the Product that are recognized or protected as intellectual property under the laws of the United States.

(d)    "Know-How" shall mean all scientific and technical information, trade secrets and data owned by ATM relating to the Product, including all confidential technical-analytical, preclinical and clinical data, literature, bulletins and other pertinent information related thereto and which may be exclusively useful to Holista in marketing and selling the Product and/or in maintaining and in filing any necessary Governmental authorizations to sell the Product.

1

(e) "License" shall mean the exclusive Product distribution and management license granted to Holista as detailed in Section 2 hereof.

(f) "Marks" shall mean all trademarks, service marks, trade dress, logos, and trade names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, that may be associated with the Product.

(g) "Product" shall mean that certain nutritional supplement designed, developed, marketed, and sold by ATM as detailed in US patent 7,943,164 and any other worldwide patents, described as a natural, over-the-counter plant-based compound that works with enzymes to metabolize carbohydrates and lower blood sugar levels.

(h) "Territory" shall mean all countries and territories throughout the world.

(i) "Unit" shall mean any manner of container in which the Product is packaged for sale on an individual basis (i.e., bottle, jar, box, etc.) and shall be a "one month dose" which at the time of this contract is not more than 15 grams of product. "One month dose" can be in the future adjusted by mutual agreement, in writing, by both parties.

(j) "Market Segment" shall be "MLM" which is defined as "Multi-level Marketing" market segment. No sales by Holista shall occur outside of an MLM system. EMULIN® and EMULIN PLUS™ will be sold exclusively in this space and no where else. ATM will undertake to ensure these brands are exclusive to Holista and de-linked to other brand efforts of ATM.

## SECTION 2. LICENSE GRANT

2.1 **License**. Conditioned upon Holista's continued satisfaction of the terms and conditions of this Agreement, ATM hereby grants to Holista and Holista hereby accepts, an exclusive license (including as to ATM) to do the following:

(a) To market, promote, and sell the Product in the Territory and in the Market Segment, and to utilize the Know How, Marks, and Intellectual Property to further Holista's efforts to market, promote, distribute, and sell the Product.

(b) To oversee and control the sourcing of ingredients, manufacture, storage, and distribution of the Product on behalf of ATM.

(c) Holista may market the Product only under the trademark EMULIN® and/or EMULIN PLUS® and shall not create or otherwise utilize any other Mark to identify the Product without the express written consent of the ATM.

(d) EMULIN® and/or EMULIN PLUS® must contain the Product and shall not be used to represent any other product or be used as a "Bait and Switch" for the sales and distribution of any other product.

2.2 **Appointment of Subdistributors**. Holista may appoint subdistributors to act on Holista's behalf; provided, however, that any compensation to such subdistributors shall be solely Holista's responsibility. Any agreement with such agent or subdistributor with respect to the Product shall be coterminous with this Agreement.

2.3 **No Other Rights**. Except as expressly provided in this Agreement, no additional right, title or interest is granted by Licensee to Holista, and no right, title or interest is granted by Licensee to Holista relating to

2

MJM

Products other than the Product. Holista agrees that ATM retains all of its right, title and interest in and to all Intellectual Property rights, including patents, trademarks, trade names, inventions, copyrights, know-how and trade secrets relating to the Product and the design, manufacture, operation or service of the Product. The use by Holista of any of these property rights is authorized only for the purposes herein set forth and upon termination of this Agreement for any reason such authorization will cease. Holista acknowledges and agrees that the rights to the Marks and other Intellectual Property granted to Holista pursuant to this Agreement are license rights only, and nothing contained in herein constitutes or shall be construed to be an assignment of any or all of ATM's rights in the Marks and other Intellectual Property.

## SECTION 3.   ROYALTIES

3.1   **Monthly Royalty:** In consideration for the License granted herein, Holista agrees to pay a monthly royalty to ATM in the amount of Fifteen Thousand Dollars ($15,000.00 USD). The monthly royalty shall be payable on the 15th of each month following that in which this Agreement was executed.

3.2   **Sales Royalty:** In further consideration for the license granted herein, Holista agrees to pay ATM an additional royalty for each Unit sold during the course of a given month in accordance with the following schedule:

(a) For the first 2,500 Units: $1.00 USD/unit;
(b) From the 2,501-5,000 Units: $0.80 USD/unit;
(c) From the 5,001-7,500 Units: $0.60 USD/unit;
(d) From the 7,501-10,000 Units: $0.40 USD/unit;
(e) Above 10,000+ Units: $0.20 USD/unit;

When Units are packaged and sold by the case, pallet, other package of multiple Units, or otherwise by the bulk, the sales royalty shall be calculated based on the number of equivalent Units that comprise the case, pallet, other package of multiple Units, or bulk sale. Holista shall calculate sales royalties for each month on or before the 15th of each month immediately following that in which sales took place. Sales royalty payments shall be made on the 15th of each month concurrent with the Monthly Royalty.

3.3   **Bulk Sales Royalty.** In the event Holista sells the Product to a third party in the MLM space on a bulk weight basis, Holista agrees to pay ATM a royalty equivalent to the schedule in section 3.2..

## SECTION 4.   OBLIGATIONS OF HOLISTA

4.1   **Marketing and Sales.** In marketing the Product, Holista agrees to exercise the same diligence, used by Holista in marketing its own Products. So long as Holista satisfies the criteria set forth in the previous sentence, all specific marketing strategies, plans and actions shall be within the discretion of Holista. Except as expressly set forth herein, Holista shall be solely responsible for all costs and expenses related to the advertising, marketing, promotion, and distribution of the Product and for performing its obligations hereunder.

4.2   **Sourcing and Manufacture.** Holista shall be responsible for the sourcing of the ingredients that comprise the Product, and for arranging for the manufacture of the Product with suitable GMP adherent contract manufacturers that are approved by the applicable regulatory authorities and ATM. Holista shall further be responsible for coordinating with ATM to transparently get the best direct prices from all suppliers, and work with manufacturers to ensure the efficient production and distribution of the Product.

4.3   **Storage, Testing, and Delivery.** Holista shall be responsible for storing and testing the Product at facilities that are approved by the applicable regulatory authority, and for arranging for the delivery of the Product

3

MJA

to customers.

4.4 **Intellectual Property Maintenance.** Holista shall at its own cost and expense maintain all registrations to the Marks, patents, and other Intellectual Properties in force in the Territory. If Holista fails do so, ATM shall have the right, but not the obligation, to maintain such registrations. Further, Holista shall, at its own cost, maintain any patents, when granted, with respect to the Product. If Holista fails to do so, ATM shall have the right, but not the obligation, to maintain such patents.

4.5 **Customer Relations.** Holista shall provide all customer relations to customers and end users of the Product, and respond to customer queries via email or telephone support line.

4.6 **Product Representations.** Holista shall not make any representations with respect to the Product other than those expressly authorized in writing in ATM's written documentation. Holista shall at all times comply with all applicable rules in the Territory relating to the marketing and sale of the Product, and to accurately describe the Product, including its attributes, ingredients, effects, and side effects, in any marketing and advertising materials.

4.7 **Operations and Expenses.** The detailed operations of Holista under this Agreement are subject to the sole control and management of Holista. Holista shall be responsible for all of its own expenses and employees. Holista shall provide, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement. Holista agrees that it shall incur no expense chargeable to ATM, except as may be specifically authorized in advance in writing in each case by ATM.

4.8 **Release.** Holista shall hold ATM free and harmless from any claim, suit, or action directed against ATM by any third party arising as a consequence of damages, liability, losses, costs and expenses caused by (a) manufacturing errors; (b) non compliance with the applicable laws, rules, and regulations in the Territory governing the manufacture, storage, marketing, distribution, and sale of the Product, except for liabilities that solely arise from ATM's negligence.

## SECTION 5. OBLIGATIONS OF ATM

5.1 **Cooperation and Support.** At all times throughout the term of this Agreement and any renewals thereof, ATM shall cooperate with Holista to further its efforts under the License, and provide Holista with reasonable access to ATM staff in connection with the same as Holista may request, and otherwise provide reasonable support and assistance to Holista in connection with its sales efforts.

5.2 **Promotional Assistance.** To assist Holista with the marketing and sale of the Product, upon request by Holista, ATM shall make Dr. Milton Joseph Ahrens ("Dr. Ahrens") available to conduct talks, guest in seminars, and otherwise take on speaking engagements to tout the benefits of the Product and the science behind its formulation. It will be endeavoured that such engagements will be an average frequency of three per calendar quarter, recognizing that the frequency may be higher at the beginning of product launch. All parties recognize there may be time and schedule conflicts. However, all parties will endeavor in good faith to resolve such conflicts. It is understood and agreed that the following costs of such assistance shall be borne by Holista: (i) Speaking Fees: $500/appearance (North America); $3,500 for a week appearance overseas; and (ii) All travel-related expenses (taxis, car rental and premium economy class airline travel).

   (a) **Book Authorship:** At Holista's request, ATM shall also cooperate in the writing and production of a book about the Product, and provide information and background regarding its development, attributes, and the scientific basis for its efficacy. It is understood and agreed that Holista shall bear all costs associated with the writing and publishing of such a book, and will pay ATM royalties in connection with its sale in a manner to be agreed upon by the Parties at a later date.

4

(b) **Exclusivity:** As Holista is investing time and resources to create an aura of credibility around Dr. Ahrens, it is understood and agreed that the promotional services provided to Holista as set forth in this Agreement shall be exclusive with respect to the Multi-Level Marketing (MLM) industry worldwide. Consequently, throughout the term of this Agreement, Dr. Ahrens shall agree to refrain from providing promotional services similar to those referenced in this Agreement to any other MLM company throughout the world. Following the termination of this Agreement, Ahrens further agrees to refrain from providing services to any individual or entity operating in the MLM industry that competes with Holista for a period of three (3) years following the termination date.

## SECTION 6.   INDEMNIFICATION

6.1   **Indemnification by Holista.**  Holista shall indemnify, defend and hold harmless ATM, together with its officers, directors, shareholders, agents, and employees (the "ATM Indemnified Parties") from and against all liabilities, losses, claims, demands, assessments, fines, damages, costs and expenses (including, without limitation, reasonable attorneys' and consultants' fees and expenses and all costs of defense) (collectively, "Liabilities") that may be incurred on account of: (a) the infringement or misappropriation of any of the Marks arising out of the marketing and/or sale of the Product during the term of this Agreement; (b) the handling, storage, transportation, distribution, promotion, marketing, and sale of the Product by Holista; (c) any injury or death suffered by an end user of the Product that directly arises from a defect in the manufacturing of the Product or its ingredients; (d) a breach or inaccuracy of any representations or warranties made by Holista in this Agreement; and (e) the gross negligence or willful misconduct of Holista or any of their agents, directors, officers or employees.  In any event triggering Holista's indemnification obligation hereunder, it shall, at its sole cost and expense, investigate, defend and otherwise deal with any suit, action, claim, complaint, investigation or proceeding in connection with the event.

6.2   **Indemnification by ATM.**  ATM shall indemnify, defend and hold harmless Holista, together with its officers, directors, shareholders, agents, and employees (the "Holista  Indemnified Parties") from and against all Liabilities that may be incurred on account of: (a) the infringement or misappropriation of any patent, trade secret or other proprietary right arising out of the development of the Product during the term of this Agreement; (b) a breach or inaccuracy of any representations or warranties made by ATM in this Agreement; and (c) the gross negligence or willful misconduct of ATM or any of its agents, directors, officers, or employees.  In any event triggering ATM's indemnification obligation hereunder, it shall, at its sole cost and expense, investigate, defend and otherwise deal with any suit, action, claim, complaint, investigation or proceeding in connection with the event.

6.3   **Additional Indemnification Provisions.**  The preceding Sections 6.1 and 6.2 notwithstanding, neither Party may settle or compromise any claim subject to indemnification without the other Party's approval if such settlement or compromise would deprive the other Party of any material rights or interests it held prior to such settlement or compromise. The Indemnified Party shall have the right to employ counsel separate from counsel employed by the Indemnifying Party, and to participate in defense thereof. The reasonable expense of such counsel shall be the expense of the Indemnified Party unless the Indemnifying Party has failed to assume the defense of the Indemnified Party or employ reasonably satisfactory counsel. The Indemnifying Party shall reimburse the Indemnified Party on a monthly basis for all reasonable fees, costs and expenses incurred by the Indemnified Party promptly after submission of statements of expenses during the pendency of such proceeding or investigation. The rights of indemnification described herein will not apply to consequential damages sustained directly by a party (including, by way of example, such party's lost profits), but may include, without limitation, consequential damages sustained by third parties.

6.4   **Limitation of Liability.**  Except in the event of willful breach or to the extent of any liability to a third party in connection with the indemnification provisions set forth in Sections 6.1, 6.2, and 6.3, in no event shall Holista or ATM be liable for any claim under this Agreement for special, indirect and/or consequential damages, including lost profits or lost revenues.

5

## SECTION 7. CONFIDENTIALITY AND NONDISCLOSURE

7.1 **Confidential Information:** For the purposes of this Agreement, "Confidential Information" shall mean any information (whether in print, electronic, or other form), relating to the Product, including its underlying technology, designs, computer systems, software, research, business plans, sales or marketing methods, methods of doing business, customer lists, customer usages and/or requirements, or which was learned, discovered, developed, conceived, originated, or prepared during or as a result of any discussions between the Parties, that: (a) is identified by any Party as confidential; or (b) would reasonably be expected by the recipient to be confidential or proprietary based on the nature of the information contained therein and the circumstances in which the materials are provided. In addition, any work Product or portion thereof relating to or derived from any Confidential Information generated by the Parties, which discloses Confidential Information shall also be deemed to be Confidential Information.

7.2 **Exclusions from Confidential Information:** "Confidential Information" shall not include: (a) Information regarding the Product which is approved for release by both parties; and (b) Information which the recipient receives from a third party without breach of this Agreement, and without the third party's breach of any obligation of confidentiality.

7.3 **Non-Disclosure:** The parties agree to maintain such Confidential Information in secrecy at all times, and to take reasonable steps (including such steps as it takes to protect its own proprietary information), prior to and after termination of this Agreement, to prevent the duplication or disclosure of any Confidential Information, other than by or to its own employees or agents who must have access to such information to carry out the purposes set forth above. The parties agree to restrict circulation of Confidential Information within its own organization to those employees who need to receive such information to carry out the purposes set forth above, and to give such employees instructions to hold in confidence all such information made available to them and to use such information only for such purposes. In addition, except as specifically provided for herein, neither party shall release, use, sell, transcribe, transfer, publish, disclose, copy, display or reproduce any Confidential Information in any manner whatsoever, nor shall it in any manner make such information, or any portion thereof, in any form whatsoever, available to any other employees, directors, consultants, contractors, agents, subsidiaries, or third parties.

7.4 **No Adequate Remedy at Law:** Each party acknowledges and agrees that it will have no adequate remedy at law if there is a breach or threatened breach of this Agreement and, accordingly, that the non-breaching party shall be entitled to an injunction against such breach. Nothing herein shall be construed as a waiver of any other legal or equitable remedies that may be available to the non-breaching party if the other party breaches this Agreement.

## SECTION 8. TERM AND TERMINATION

8.1 **Term.** The License granted under this Agreement shall commence upon execution of this Agreement by both parties and continue for a period of five (5) years thereafter. This Agreement shall automatically renew for additional five-year terms unless terminated by either party at least ninety (90) days prior to the expiration of a term.

8.2 **Termination.** This Agreement may be terminated prior to the expiration of the initial term as follows:

(a) By either party based upon the other party's breach of any material term or condition of this Agreement; provided, however that the non-breaching party must notify the other of the nature of the breach in writing, which must describe the nature of the breach in detail. The breaching party shall then have a sixty (60) day cure period in which to cure the breach, or, if such breach cannot be

6

reasonably cured within said period, such longer period as is commercially reasonable to cure such breach. If after such period the breaching party is still in material breach of contract, the other Party shall have the right to cancel this Agreement forthwith, without prejudice to any obligations or liabilities of either Party already accrued prior to such termination.

(b) By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated; or

(c) By ATM, effective immediately, if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Holista that prevents Holista from fulfilling its obligations hereunder.

(d) By mutual written agreement.

8.3  **Rights Upon Termination.**  Upon termination of this Agreement for any reason, all rights granted to Holista hereunder shall cease, and the license granted to Holista shall be considered null and void, and of no force or effect. Holista will within sixty (60) days refrain from using any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM and shall return to ATM and immediately cease all use of Confidential Information previously furnished by ATM. Notwithstanding the foregoing, Holista shall fulfill all purchase orders submitted as of the date of termination with its then-current inventory. Holista shall take any desirable and necessary step, as permitted by applicable law, to return to ATM or to any other company designated by ATM in writing, the possibility for marketing the Product within the Territory.

8.4  **Purchase of Inventory.**  Upon termination of this Agreement for any reason, ATM, at its option, will purchase from Holista at the price paid by Holista, and Holista agrees to sell to ATM upon exercise of said option, all or any part of remaining inventories after fulfillment of existing purchase orders at Holista costs, plus transportation and handling, provided that such inventories/stock conform to the provisions of the present Agreement. Such option shall be exercised by written notice within sixty (60) days from effective date of termination. Should ATM not exercise such option, and notwithstanding the termination of the License, Holista shall be entitled to sell the Product at prices that will not perturb the market and/or the ordinary distribution of the Product by ATM or any new distributor.

## SECTION 9.  REPRESENTATIONS, WARRANTIES, AND COVENANTS

9.1  **By ATM**. ATM hereby represents, warrants, and covenants the following:

(a) It is a duly organized, validly existing company under the laws of the United States and the State of Florida;

(b) It has the requisite authority and the unrestricted right to execute and deliver this Agreement and to perform its obligations hereunder in accordance with the terms of this Agreement;

(c) ATM's rights in the Product, including all rights in the Intellectual Property, Marks, and Know-How, are free and clear of all liens, security interests, or other encumbrances;

(d) The execution and performance of this Agreement are not and will not be in violation of, or constitute a default under, or conflict with the organic documents of ATM, any judgment, decree, order or award of any court, governmental body or arbitrator having jurisdiction over ATM, any applicable law, or any contract or other obligation to which ATM is a party or by which it is bound;

7

(e) There are no investigations, adverse third party allegations, actions, or claims against ATM, including any pending or, to it's knowledge, threatened action against ATM, in any court or by or before any governmental body or agency, with respect to the Product, or its obligations set forth herein which may adversely affect ATM's ability to perform its obligations under this Agreement;

(f) The manufacture, sale or use of the Product provided by Holista under this Agreement will not infringe any patent right, trade secret or other government grant of intellectual property of any third party, or otherwise violate any applicable laws

EXCEPT FOR THE REPRESENTATIONS, WARRANTIES, AND COVENANTS UNDER THIS AGREEMENT, ATM MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

9.2    **By Holista**. Holista hereby represents, warrants, and covenants the following:

(a) It is a duly organized, validly existing company under the laws of Australia and the State of Western Australia;

(b) It has the requisite authority and the unrestricted right to execute and deliver this Agreement and to perform its obligations hereunder in accordance with the terms of this Agreement;

(c) It currently possesses and shall, at its own cost, maintain all necessary licenses, permits, registrations, or approvals required by relevant governmental agencies in connection with the manufacture, filling, package, storage, marketing, sale, and shipment of Product, and is in compliance in all material respects with such licenses, permits, registrations and approvals;

(d) Any Product delivered by or on behalf of Holista shall, at time of shipment have been formulated, manufactured, packaged and stored at facilities approved by relevant authority, in conformity with CGMP requirements, the Product specifications, and applicable law, and shall not be adulterated, misbranded or otherwise determined to be in violation of any applicable statute, rule, or regulation;

(e) There are no investigations, adverse third party allegations, actions, or claims against Holista, including any pending or, to its knowledge, threatened action against Holista, in any court or by or before any governmental body or agency, with respect to the Product, or its obligations set forth herein which may adversely affect Holista's ability to perform its obligations under this Agreement;

(g) Holista will comply with any applicable law, regulations, governmental order, ethical code, related to or in connection with the activity of promotion and marketing of the Product in the Territory.

### SECTION 10.    GENERAL PROVISIONS

10.1    **No Waiver:** No delay or omission to exercise any right, power, or remedy accruing to a party on any breach or default of the other party under the terms of this Agreement shall impair any such right, power, or remedy of the non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence in such breach or default, or waiver of or acquiescence in any similar breach or default occurring later; nor shall any waiver of any single breach or default be considered a waiver of any other prior or subsequent breach or default.

10.2    **Notices.** Any notice or other communication required or permitted to be given under the terms of this Agreement shall be mailed, emailed, or delivered to the other party at the intended recipient's confirmed

8

address, and shall be effective and deemed received: (i) via e-mail at the designated e-mail address of the receiving Party, with delivery confirmation; (ii) via U.S. mail, if mailed three (3) days after placement in the United States mail postage prepaid, by registered or certified mail, return receipt requested, (iii) if via overnight mail, on the day delivered, or (v) if personally delivered, when delivered to the last known address of Buyer and/or Seller.

10.3   **Applicable Law.**  The execution of this Agreement and performance hereunder shall be governed by the State of California irrespective of conflict of law rules. In the event any Party hereto institutes any legal action in connection with any matter contained this Agreement, such legal action shall be instituted in San Diego County, California. Each Party hereto waives any objection which it may have at any time to the venue of any suit, action or proceeding arising out of or relating to the Agreement, brought in such Courts and waives any claim that such suit, action or proceeding brought in any such Courts has been brought in an inconvenient forum or that such Court lacks jurisdiction of said Party. The Agreement will be construed in accordance with and governed by the laws of the State within which any legal action is commenced. Process may be served on either Party in the manner authorized by applicable law or Court Rule.

10.4   **Assignment.**  This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns. Notwithstanding the foregoing, this Agreement and the Parties' rights and obligations under this Agreement shall not be assigned by a party to another Person without the prior written consent of the other Parties.

10.5   **Entire Agreement.**  This Agreement, together with the Schedules and Exhibits attached hereto and the certificates delivered in connection herewith, embodies the entire agreement and understanding of the Parties hereto and supersedes any prior agreement or understanding between the Parties with respect to the subject matter of this Agreement.

10.6   **Severability.** If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions will nevertheless remain in full force and effect. The parties agree to renegotiate in good faith those provisions so held to be invalid to be valid, enforceable provisions which provisions shall reflect as closely as possible the original intent of the parties, and further agree to be bound by the mutually agreed substitute provision.

10.7   **Force Majeure.** Except for payment of monies, neither party shall be liable for failure to fulfill its obligations under this Agreement or any purchase order issued hereunder or for delays in delivery due to causes beyond its reasonable control, including, but not limited to, acts of God, man-made or natural disasters, earthquakes, fire, riots, flood, material shortages, strikes, delays in transportation or inability to obtain labor or materials through its regular sources. The time for performance of any such obligation shall be extended for the time period lost by reason of the delay.

10.8   **Headings.** Headings of paragraphs herein are inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Exclusive Product Management and Distribution Agreement as of the date first above written.

ATM METABOLICS, LLC

By: _____

Name: M. Joseph Ahrens, PhD.

HOLISTA COLLTECH LTD.

By: _____

Name: RAJEN MANICKA

9

Title: _Managing Director_

Date: _6 February 2017_

Title: _CEO_

Date: _9 February 2017_

**ACCEPTANCE BY DR MILTON JOSEPH AHRENS**

I, Dr. Milton Joseph Ahrens, acting individually and on my own behalf, do hereby accept and agree to the terms set forth in Section 5.2 of this Agreement.

By: _____

Milton Joseph Ahrens

Date: _6 February 2017_ .

10



**THE CONCEPT LAW GROUP, P.A.**

**PATENTS | COPYRIGHTS | TRADEMARKS**

6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
Tel: (754) 300-1500    www.ConceptLaw.com
Fax: (754) 300-1501    Info@ConceptLaw.com

January 8, 2019

<u>**Via Email**</u>
Holista Colltech, Ltd.
Dr. Rajen Manicka (rajen.m@holistaco.com)

Law Offices of Seth W. Weiner
Seth W. Weiner (seth@sethwienerlaw.com)

      **Re:**    *Termination of Exclusive Product Management & Distribution Agreement*

Dear Dr. Manicka:

      As you may know, this firm represents ATM Metabolics, LLC ("ATM") and Dr. Ahrens. We write to regrettably inform you that pursuant to Section 8.2(c) of the Exclusive Product Management and Distribution Agreement (the "Agreement") between ATM and Holista Colltech, Ltd., ATM hereby terminates said Agreement, effective immediately.

      Specifically, *and at an absolute minimum*, Holista's election to fire Dori O'Neill and Jana Jorgenson, and the subsequent fallout from same, has resulted in a material change in Holista's sales personnel, sales and marketing capability, and overall financial condition, which has prevented (and will continue to prevent) Holista from carrying out its obligations under the Agreement as was intended by the parties. Nevertheless, should Holista contend that it continues to have the same capabilities and financial positioning as it held during O'Neill and Jorgenson's tenures, please advise by **12:00 pm PT on Friday, January 11, 2019** with a detailed explanation of how Holista believes it has such operational and financial infrastructure to fulfill all obligations under the Agreement as intended. Absent a satisfactory and timely substantiation of your wherewithal to fulfill your contractual obligations, ATM will consider this matter closed, and trusts that you will strictly adhere to your post-termination obligations pursuant to Section 8.3.

      Regards,

      Adam S. Goldman, Esq.
      For the Firm

Cc:    Dr. Joe Ahrens
      Matthew Kaplan, Esq.

January 9, 2019

**VIA ELECTRONIC MAIL**
info@conceptlaw.com

Adam S. Goldman, Esq.
The Concept Law Group, P.A.
6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309

Re:    *Holista Colltech, Ltd. v. Ahrens and ATM Metabolics, LLC,* Superior Court of
       California for the County of San Diego, Case No. 37-2019-00055953-CU-BC-CTL
       Response to January 8, 2019 Letter re Termination of Exclusive Product Management
       and Distribution Agreement

Dear Mr. Goldman,

I am in receipt of your January 8, 2019 letter to Dr. Rajen Manicka purporting to terminate the Exclusive Product Management and Distribution Agreement (the "Agreement") between ATM Metabolics, LLC and Holista Colltech, Ltd. ("Holista") effective immediately. As you are aware, I represent Holista in the above-captioned lawsuit between our clients, and your direct communication with Dr. Manicka constitutes a violation of Rule 2-100 of the California Rules of Professional Conduct and Rule 4-4.2 of the Florida Rules of Professional Conduct. Please refrain from any further direct communications with my client.

In response to your letter, there has not been any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Holista that prevents Holista from fulfilling its obligations under the Agreement, and your letter does not provide any support for your contention that Holista has failed to meet its contractual obligations. As such, ATM's unilateral termination of the Agreement is improper, and Holista will seek appropriate judicial redress based thereon.

All of my client's rights and remedies are expressly reserved.

Very truly yours,

Seth W. Wiener

cc:   Client
      Matthew Kaplan, Esq.



**THE CONCEPT LAW GROUP, P.A.**

PATENTS | COPYRIGHTS | TRADEMARKS

6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
Tel:  (754) 300-1500    www.ConceptLaw.com
Fax:  (754) 300-1501    Info@ConceptLaw.com

March 6, 2019

**Via Email**
Law Offices of Seth W. Weiner
Seth W. Weiner (seth@sethwienerlaw.com)

> **Re:**    ***ATM's Notice of Intent to Exercise Option Pursuant to Section 8.4 of the Exclusive Product Management and Distribution Agreement***

Dear Seth:

As per your prior instruction to direct all communications regarding the Exclusive Product Management and Distribution Agreement (the "Agreement") to you only, we write on behalf of our client, ATM Metabolics, LLC ("ATM"), pursuant to Section 8.4 of the Agreement, to inform you of ATM's intent to exercise its option to purchase from Holista Colltech Limited ("Holista") its remaining inventory of "Emulin C" and "Emulin M".  However, because the relationship between our respective clients has soured, and Holista has not provided ATM with up-to-date inventory and cost figures, ATM needs to know the following information before it can firmly commit to making such purchases:

- Remaining inventory of "Emulin C" and "Emulin M" after fulfillment of purchase orders existing as of the date of this letter;

- Purchase price of remaining inventory of "Emulin C" and "Emulin M" paid by Holista;

- Costs to Holista of remaining inventory of "Emulin C" and "Emulin M"; and

- Expiration date(s) of remaining inventory of "Emulin C" and "Emulin M".

As soon as the above-requested information is provided, ATM will inform Holista how to proceed. Inasmuch as the sixty-day period as set forth in Section 8.4 expires on March 9, 2019, your attention to this matter is greatly appreciated. However, if Holista requires additional time to gather the requested information, ATM is not opposed to a brief extension of this time period.  We look forward to your response.

Regards,

Adam S. Goldman, Esq.
For the Firm

Cc:    Dr. Joe Ahrens; Matthew Kaplan, Esq.

LAW OFFICES OF SETH W. WIENER
609 KARINA COURT
SAN RAMON, CA 94582
(925) 487-5607
WWW.SETHWIENERLAW.COM

March 7, 2019

**VIA ELECTRONIC MAIL**
info@conceptlaw.com

Adam S. Goldman, Esq.
The Concept Law Group, P.A.
6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309

Re:     *Holista Colltech, Ltd.'s Response to ATM's Notice of Intent to Exercise Option*
        *Pursuant to Section 8.4 of the Exclusive Product Management and Distribution*
        *Agreement*

Dear Mr. Goldman,

    On behalf of Holista Colltech, Ltd. ("Holista"), I am writing in response to your March 6, 2019 letter regarding ATM Metabolics, LLC's ("ATM"), intent to exercise its option to purchase Holista's remaining inventory of "Emulin C" and "Emulin M".   Please be advised that Holista's position is that ATM's purported termination of the Exclusive Product Management and Distribution Agreement is improper, and, accordingly, ATM has waived its right to purchase all or any part of the remaining inventory. All of my client's rights and remedies are expressly reserved.

                    Very truly yours,

                    Seth W. Wiener

cc:   Client

| | |
|---|---|
| **From:** | Seth Wiener <sethwiener@yahoo.com> |
| **Sent:** | Friday, March 08, 2019 3:33 PM |
| **To:** | seth@sethwienerlaw.com; Adam Goldman |
| **Cc:** | Alex Brown; Kaplan, Matthew I.; Joanna Lubczanska; Rothwell, Christina |
| **Subject:** | Re: Holista Colltech, Ltd.'s Response to ATM's Notice of Intent to Exercise Option Pursuant to Section 8.4 of the Exclusive Product Management and Distribution Agreement |

Adam,

I will respectfully decline to elaborate on my client's position on this issue.

```
Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com
```

On Friday, March 8, 2019, 12:22:07 PM PST, Adam Goldman <agoldman@conceptlaw.com> wrote:

Seth:

Thank you for your prompt response.

Although ATM obviously disputes that the termination letter was improper, even if such were the case, can you explain how that would result in ATM waiving its right to purchase the remaining inventory?

Thanks.

Best Regards,

Adam Goldman

The Concept Law Group, P.A.

An Intellectual Property Law Firm

Exhibit F, Page 15

6400 North Andrews Ave., Suite 500

Fort Lauderdale, FL 33309

Office:     (754) 300-1500

Direct:     (754) 702-7002

Fax:        (754) 300-1501

www.ConceptLaw.com

agoldman@ConceptLaw.com

**NOTICE: This e-mail message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, retransmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it. If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 754.300.1500 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by the sender.**

**From:** Seth Wiener [mailto:sethwiener@yahoo.com]
**Sent:** Thursday, March 07, 2019 8:53 PM
**To:** Adam Goldman <agoldman@conceptlaw.com>
**Subject:** Holista Colltech, Ltd.'s Response to ATM's Notice of Intent to Exercise Option Pursuant to Section 8.4 of the Exclusive Product Management and Distribution Agreement

Law Offices of Seth W. Wiener
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
www.sethwienerlaw.com



THE CONCEPT LAW GROUP, P.A.

PATENTS | COPYRIGHTS | TRADEMARKS

6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
Tel: (754) 300-1500   www.ConceptLaw.com
Fax: (754) 300-1501   Info@ConceptLaw.com

April 8, 2019

<u>**Via Email**</u>
Law Offices of Seth W. Weiner
Seth W. Weiner (seth@sethwienerlaw.com)

   Re: *Holista Colltech, Ltd. v. ATM Metabolics, LLC*

Dear Seth:

   As you know, on January 8, 2019, elected to terminate the Product Management and Distribution Agreement ("Agreement") pursuant to Section 8.2(c). Accordingly, on March 6, 2019, pursuant to Section 8.4 of the Agreement, ATM sent Holista a letter informing Holista that ATM intended to exercise its option to purchase from Holista its remaining inventory of "Emulin C" and "Emulin M". Considering Holista had failed to furnish ATM with up-to-date inventory and cost figures, ATM requested that Holista provide such information. Not only did Holista fail to do so, it responded by claiming, without any factual or legal support, that ATM had somehow "waived its right to purchase all or any part of the remaining inventory."

   Please be advised that Holista's refusal to furnish the requested information and its remaining inventory of Emulin C and Emulin E constitutes a material breach of Section 8.4 of the Agreement, and ATM intends to pursue all remedies available to it flowing from this additional breach.

   Moreover, pursuant to Section 8.3 of the Agreement, within 60 days of termination (*i.e.*, by March 9, 2019), Holista was required to cease all use of "any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM and shall return to ATM and immediately cease all use of Confidential Information previously furnished by ATM." Despite the clear mandate of this provision, it is indisputable that Holista has, yet again, failed to comply with its obligations. Consequently, these actions constitute an additional breach of the Agreement by Holista, as well as willful trademark infringement. Please be advised ATM intends to pursue all remedies available to it flowing from these unlawful actions.

   Finally, as you may recall, on January 18, 2019, pursuant to Section 8.2(a) of the Agreement, ATM put Holista on notice that Holista's failure to remit payment of monthly license and royalty fees constituted a separate material breach of Section 3 of the Agreement. Despite its demand, Holista has failed to cure this material breach within the 60-day cure period. Accordingly,

and although it is unnecessary to invoke due to ATM's termination of the Agreement on January 8, 2019, for the avoidance of any doubt, ATM hereby cancels the Agreement, effective immediately, pursuant to this additional material breach.

This letter is not intended to be exhaustive of ATM's legal rights and remedies, as all such rights, remedies and defenses are specifically preserved.

Regards,

Adam S. Goldman, Esq.
For the Firm

Cc:     Dr. Joe Ahrens; Matthew Kaplan, Esq.



**THE CONCEPT LAW GROUP, P.A.**

PATENTS | COPYRIGHTS | TRADEMARKS

6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
Tel:   (754) 300-1500   www.ConceptLaw.com
Fax:  (754) 300-1501   Info@ConceptLaw.com

April 9, 2019

<u>**Via Email**</u>
Law Offices of Seth W. Weiner
Seth W. Weiner (seth@sethwienerlaw.com)

   *Re:*  *Holista Colltech, Ltd. v. ATM Metabolics, LLC*

Dear Seth:

   As a follow-up to my April 8, 2019 letter, and specifically concerning Holista's breach of Section 8.3 of the Agreement, please be advised that not only are Holista and iGalen required to cease "using any of the ATM Marks, accepting new purchase orders, and otherwise conducting all manufacturing, distribution, sales, and other activities on behalf of ATM," but it should go without saying that Holista and iGalen should have long ago ceased from utilizing the name, image, and likeness of Dr. Ahrens in any medium and in any manner whatsoever. Unfortunately, however, your clients clearly are more desirous of engaging in the unauthorized use of Dr. Ahrens' name and likeness. To this end, let it be clear that ATM and Dr. Ahrens hereby further demand that Holista and iGalen immediately and permanently remove all references to Dr. Ahrens on any website, marketing materials, social media, and any other mediums in which Dr. Ahrens's name, image, or likeness appears.

   Failure to immediately and finally comply with this obligation will subject Holista and iGalen to further liability for, at an absolute minimum, a violation of Dr. Ahrens' right of publicity.

   Regards,

   Adam S. Goldman, Esq.
   For the Firm

Cc:  Dr. Joe Ahrens; Matthew Kaplan, Esq.